**Arthur JONES, Plaintiff,**

v.

**AMERICAN BROADCASTING COMPANIES, INC., Defendant.**

No. 87–412–CIV–T–17(C).

United States District Court, M.D. Florida, Tampa Division.

Sept. 7, 1988.

Paul A. Louis, Sinclair, Louis, Siegel, Heath and J.F. Dougherty, II, Miami, Fla., for plaintiff.

Gregory G. Jones, Christopher L. Griffin, Carlton, Fields, Ward, Emmanuel Smith, Cutler & Kent, P.A., Tampa, Fla., for defendant.

## ORDER ON MOTION FOR SUMMARY JUDGMENT

KOVACHEVICH, District Judge.

This cause of action is before the Court on Defendant's motion for summary judgment filed November 6, 1987, Plaintiff's response to issues 1, 3, and 5 filed April 15, 1988, and the court-ordered joint memorandum filed June 7, 1988.

This circuit clearly holds that summary judgment should only be entered when the moving party has sustained its burden of showing the absence of a genuine issue as to any material fact when all the evidence is viewed in the light most favorable to the nonmoving party. *Sweat v. The Miller Brewing Co.*, 708 F.2d 655 (11th Cir.1983). All doubt as to the existence of a genuine issue of material fact must be resolved against the moving party. *Hayden v. First National Bank of Mt. Pleasant*, 595 F.2d 994, 996–7 (5th Cir.1979), quoting *Gross v. Southern Railroad Co.*, 414 F.2d 292 (5th Cir.1969). Factual disputes preclude summary judgment.

The Supreme Court of the United States held, in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986),

In our view the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. 477 U.S. at 322, 106 S.Ct. at 2552, 91 L.Ed.2d at 273.

The Court also said, "Rule 56(e) therefore requires that nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553, 91 L.Ed. 2d at p. 274.

The complaint in this cause of action was filed March 24, 1987. The complaint seeks compensatory and punitive damages (one billion dollars in compensatory and three billion dollars in punitive damages) for an alleged defamatory program broadcast on Defendant's news program 20/20 on March 12, 1987. The complaint asserts that the news broadcasters of that program conspired to betray Plaintiff on national television and to portray him as dishonest, a liar, and a man who is cruel to animals. Plaintiff asserts that the defamatory statements were made with malice and based on a conspiracy to destroy his reputation for truth and honesty.

On November 6, 1987, Defendant filed a motion for summary judgment, alleging there is no genuine issue of material fact and that summary judgment is appropriate. The following issues were presented by the motion for summary judgment:

1. Plaintiff must, but has failed to, specify the particular statements of fact in the broadcast that allegedly defamed him, offering instead a non-specific, "shotgun" condemnation that is, as a matter of law, insufficient.

2. Plaintiff has failed to prove by any evidence, much less by the requisite clear and convincing evidence, that any statement made by Defendant was false.

3. The statements upon which Plaintiff purports to base his claim are not reasonably capable of a defamatory meaning.

4. Being a "public figure", Plaintiff must, but has failed to, show that Defendant acted with "actual malice", that is, with knowledge that its statements were false or with reckless disregard for their truth.

5. The statements about which Jones complains were non-actionable opinion, which is protected absolutely by the First Amendment.

Plaintiff, thereafter, filed a motion to compel certain discovery:

1. all original out tapes, or all original videotape films, made in the production of "Save the Elephants", March 12, 1987;

2. copy of the videotape of the entire program 20/20 for March 12, 1987;

3. all notes, memoranda, written documents, original handwritten correspondence, used by any staff or employees in the preparation of the program "Save the Elephants";

4. all original out tapes, or all original videotape films, made in the production of the segment "The Flying Elephants", broadcast in 1984;

5. copy of the videotape of the entire 1984 20/20 program containing the segment "The Flying Elephants";

6. all notes, memoranda, written documents, original handwritten correspondence, used by staff or employees, in the preparation of the segment "The Flying Elephants";

7. copies of all notes, memoranda and correspondence between ABC and Pat Derby with respect to the program "Save the Elephants" from January 1, 1986, through the date of the motion;

8. copies of all original handwritten notes, inter-office memoranda, and other documents prepared by Barbara Walters, Hugh Downs, and Roger Caras in preparation of the program "Save the Elephants" from the date the program was first conceived through the date of the motion, exclusive of correspondence to any attorney subsequent to on or about March 16, 1987;

9. copies of original telephone logs reflecting calls between agents, officers, or employees of ABC with respect to the preparation and showing of the program "Save the Elephants", as well as any documents, notes, or other memoranda reflecting returned or original phone calls;

10. copies of all correspondence, notes, or memoranda received by ABC as a result of the broadcast of the program "The Flying Elephants" in 1984; and

11. copies of all letters, telegrams, or other written documents received by ABC as a result of the broadcast of the program "Save the Elephants" on March 12, 1987.

On November 6, 1987, Defendant filed a suggestion to the court, in the nature of a request for protection, regarding discovery.

Defendant offered to provide videotapes and transcripts, of the broadcast in question, at Plaintiff's request and expense. Defendant moved the court to deny any other discovery at that point, as the case was clearly frivolous. Defendant, additionally, filed an opposition to the motion to compel and again moved the court to deny further discovery until the resolution of the motion for summary judgment.

A hearing was held by Magistrate Jenkins on the motion to compel December 9, 1987. On January 29, 1988, Magistrate Jenkins issued her order on the pending discovery matters. The order determined that three (3) of the issues of the summary judgment motion presented issues to which the discovery sought by Plaintiff had no relevance, specifically issues one, three, and five. The order directed Plaintiff to respond to those three issues of the motion for summary judgment and deferred ruling on the motion to compel pending resolution of issues one, three, and five of the motion for summary judgment.

On February 8, 1988, Plaintiff filed a pleading entitled "Objections to or Petition for Hearing on Appeal of Magistrate's Order and Memorandum of Law." On March 22, 1988, this Court denied Plaintiff's objections to the magistrate's order and affirmed her ruling that issues one, three, and five of the motion for summary judgment resolved prior to subjecting the parties to extensive and expensive discovery that is of no relevance to those issues.

## FINDINGS OF FACT

The following findings of fact are relevant to the disposition of the motion for summary judgment, some are the undisputed findings delineated by the parties in the court-ordered joint memorandum:

1. The Court has jurisdiction over the subject matter of this cause based on diversity of citizenship, pursuant to 28 U.S.C. § 1332.

2. American Broadcasting Companies, Inc. (hereafter ABC) broadcast the March 12, 1987, segment of the news magazine 20/20 entitled "Save the Elephants," in-

cluding the "lead-ins," that are issues in this case.

3. Plaintiff Arthur Jones is the millionaire inventor of the Nautilus exercise machines. Plaintiff claims the segment in question constitutes defamation; the complaint states that he has "deservedly" built a national and international reputation as an entrepreneur and inventor of medical and exercise equipment, which has been sold to hundreds of thousands of purchasers throughout the world. Plaintiff also states he has previously enjoyed an excellent reputation as author of hundreds of articles on the topics of exercise, muscle structure, strength training principles, flexibility and metabolic condition, and rehabilitation or injuries; these articles have been published throughout the world.

4. The Court finds that over the years Plaintiff has invited media attention and has been the subject of repeated media coverage, including coverage in such publications as the *Wall Street Journal, Newsweek, Business Week, Forbes, Playboy,* and *Time.* (Ex. B, pgs. 1–21). At one point, Plaintiff was the subject of a report on the television program "Lifestyles of the Rich and Famous." Subsequent to that program, it was reported that Plaintiff intended to sue the host of that program, Robin Leach, and was quoted as saying, "Leach 'is a malicious liar ...' " (Ex. B., pg. 16).

5. The coverage of Plaintiff has not been limited to his business affairs, but has also covered aspects of his personal life. Some aspects of his personal life that have been reported by the media are; 1) Jones packs an antique Colt 45 at all times; 2) Jones "gulps coffee by the pot and fast food by the bagful, chain smokes, and nibbles constantly from bowls of Hershey's Kisses and cheese puffs scattered about his office"; 3) " ... Jones tends toward drab, baggy outfits that he may not change for days"; 4) each of Plaintiff's wives, five total, have been 16 to 20 years old at the time they wed; 5) Jones " ... has told his children they will never see any of his fortune, 'Leaving it to people destroys them.' "; 6) tales of Jones days as a big game hunter; 7) the animals that he houses on this farm, which have included a gorilla, a pair of rhinoceroses, Galapogos turtles, African elephants, snakes, and crocodiles; and 8) his bottom line " ... So I would like to live as long as possible and mind my own business and do things that matter—younger women, faster airplanes, and bigger crocodiles." (Ex. B, pgs. 1–21).

6. On March 16, 1987, by letter, demanded Defendant retract the contents of the broadcast. The retraction demand letter is attached as Exhibit C of the complaint.

7. Exhibit B to the complaint is a true and correct videotape copy of a portion of the March 12, 1987, "Save the Elephants" segment of the 20/20 broadcast, which is the basis of the complaint herein. The first two "lead-ins" to the segment are not a part of Exhibit B. The complaint makes no allegation that these "lead-ins" are defamatory; they were first referred to in the April 15, 1988, response to the motion for summary judgment. Exhibit C to the motion for summary judgment is a written transcript of the segment in question.

8. Exhibit 16, Plaintiff's Appendix, is a true and correct copy of the entire broadcast of the 20/20 news program for March 12, 1987. This tape contains portions which are not claimed to be defamatory.

9. In 1984, Plaintiff transported sixty-three (63) baby African elephants from Zimbabwe to his Ocala, Florida, property aboard a 707 jetliner. Plaintiff purchased the elephants from Zimbabwe to prevent them from being killed in a "cull" of the elephant herd. Defendant broadcast a segment on its news program 20/20 entitled "The Flying Elephants". This news segment followed the efforts of Plaintiff to purchase the baby elephants and transport them to the Ocala property.

10. The herd resided on Plaintiff's estate Jumbolair until on or about July 21, 1986, when the elephants began to be dispersed pursuant to an agreement signed with David Meeks of the Little Mountain Zoological Park, in Inman, South Carolina.

11. The following is the transcript of the March 12, 1987, broadcast of the seg-

ment "Save the Elephants", including the lead-ins to the segment (material not related to this segment has been omitted and the omission is indicated by the use of asterisks):

Hugh Downs: Good evening, I'm Hugh Downs.

Barbara Walters: And I'm Barbara Walters. And this is 20/20.

\*      \*      \*      \*      \*      \*

Downs (voice over): \* \* \* \* and in 1984, these baby elephants walked into our hearts when 20/20 reported how this Florida millionaire airlifted them to safety. Now the herd must be disbanded, and their future is in doubt. Are we all at fault?

Pat Derby, Elephant Expert: What we do to animals in general is not wonderful; what we do to elephants is horrible.

Downs (voice over): Roger Caras asks if the dream has gone sour, and why its time again to save the elephants.

\*      \*      \*      \*      \*      \*

Walters: Well, later in this program, we'll follow up on the fate of some baby African elephants to whom a promise was not kept. \* \* \* \*

\*      \*      \*      \*      \*      \*

Downs: \* \* \* \*, but next, they say elephants never forget, but sometimes people, unfortunately, do. Roger Caras reports why it may be time once again, to "Save the Elephants." Stay with us.

## SAVE THE ELEPHANTS

Downs: It's been almost three years now since 20/20 first reported on this man, eccentric Florida millionaire and inventor of the Nautilus exercise machines, Arthur Jones, and his daring airlift rescue of a herd of baby African elephants marked for death. It was one of the most talked about segments we've done here. But, as ABC News nature and wildlife correspondent Roger Caras tells us, what we thought was the happy ending to this elephant story is actually, according to the experts, the beginning of a sad and painful journey.

Arthur Jones, Entrepreneur: I simply could not live with myself if I idly stood by and watched the African elephant become extinct.

Roger Caras (voice over): That's how Florida millionaire Arthur Jones explained his mission in 1984, when 20/20 first reported this story. Jones wanted to rescue baby elephants in Zimbabwe from a cull, or thinning of the herd, like this one. [videoclip of elephants being shot] This was the dramatic scene in 1984, when Jones took one of his three 707s across the Atlantic and into the heart of the African continent. His commitment seemed both emotional and financial. He paid Zimbabwe $750 for every baby elephant they let him save. Sixty-three badly frightened babies were loaded up and then, as the sun began to set, Jones had to round up his people.

Mr. Jones: Buck, take that damn vehicle and run over and tell those people to get here now.

Caras (voice over): Since the African airstrip had no lights, a delay in takeoff would mean no takeoff, because the pilot was afraid of other wild animals wandering out onto the strip. The crew was also worried about whether the plane would lift off at all, with 40,000 pounds of elephants aboard. Finally airborne, the tension in the cockpit eased, even if the elephants in the cargo bay were not convinced. All night long, the ghostly figures of the handlers moved around, as they tried to calm the babies. After a hair-raising 22 hour flight, they arrived at Jones' ranch for, it was assumed, the rest of their lives. At least, that was the impression Jones gave.

Mr. Jones: We're going to give them an opportunity to survive and to build a self-sustaining herd of African elephants in this country.

Caras (voice over): For two and a half years, the Zimbabwe orphans lived the good life here on Arthur Jones' estate in central Florida. But all of that's coming to an end. The herd is being dispersed. Pat Derby is an experienced elephant handler. She says splitting up the herd

is a terrible mistake, that nature intended elephants to live in family groups.

> *Pat Derby*, Elephant Expert: These are extremely social animals. They live for each other, literally, and when you pull a baby elephant out of that situation, that's stressful in itself. I've known of elephants to die just from that.

*Caras* (voice over): And just how big was and is the Ocala herd? The 63 that were brought from Zimbabwe joined 33 Jones already had from another source, 96 elephants total. Not the typical American home. Twelve of those died of a variety of problems, but considering what they'd gone through, that isn't that bad a result. It should be made clear that Jones' elephants got the very best care from keepers and veterinarians. Eighty-four elephants, then, survived. But there are only 53 there now. That means 31 have gone someplace, Jones says the elephants were sold by someone else, while he was selling his business, Nautilus Sports Medical Industries, Incorporated, to Ward International Corporation.

> *Mr. Jones*: I lost total control of all my assets. Things were done in the way of disposing of elephants during the time that I was not in control that I simply couldn't prevent.

*Caras* (voice over): But Ward says they didn't control anything until August 1986. They never sold any elephants, and the agreement to sell them to a part-time animal dealer named David Meeks was signed by Jones' foreman, Ralph Cramer, in July.

> *Ms. Derby*: Ralph Cramer told me, when I was in Florida in May, that Arthur had told him to dispose of as many of the elephants as he could.

*Caras* (voice over): When the elephants do leave Florida, this is their first stop, the Little Mountain Zoological Park, in Inman, South Carolina. It's here that their conditioning and training begins for the lives that have been chosen for them. David Meeks runs this private zoo, and although the animals appear well while they are here, the elephants don't get to stay here. Meeks says he tries to find good homes for the elephants, but good homes are hard to find for animals who may be 12 feet tall, weigh eight to ten tons and be able to walk through concrete walls. And what kinds of homes has Meeks chosen so far? Three elephants, at least, went to private individuals as pets. Eight to small animal parks and circuses not checked out by Meeks. The sales were made over the telephone. And one to an animal trainer who Meeks himself admitted to 20/20 uses cruel training techniques. All these are perfectly legal transactions. The problem is, an elephant, once stripped of its herd, dumped so to speak, will become extremely dangerous if not properly handled.

> *Ms. Derby*: So many dumped elephants become quote "rogues," because they're mishandled, they're the victims of improper diet, of every kind of atrocity in the world. Their only way to retaliate, they do one of two things, they either attack or they run.

> *David Meeks*, Animal Dealer/Trainer: When I sell it, I try to make a decision at that time if it's going to a good place, and I want to know that that person is going to be okay, okay? I can't tell, if he comes here in one day, if he's okay or not. But if this guy is USDA-licensed, someone has said that he's okay other than himself.

*Caras* (voice over): There are a few problems with that theory. First, the USDA elephant licensing standards are minimal at best. Second, they are too understaffed to do very many meaningful inspections. Finally, private owners who don't exhibit their animals are exempt from regulations.

> *Ms. Derby*: Today, anybody with the money to purchase an elephant can get an elephant. There is no provision for quality of life. There is not provision for expertise. We have no, absolutely no, laws which protect the elephants or the people.

*Caras*: I don't imagine a baby elephant has the kind of mind that harbors expec-

tations, but if one did, I don't think that any one of the elephants David Meeks sold expected to end up here, in Davenport, Florida, at the Liebel Family Circus. But one was sent here. It died just after a few months. Mr. Liebel's previous elephant died too. As recently as last December, the USDA inspector found this place suitable for elephants. Mr. Liebel agreed to meet us at his circus' winter headquarters, but when we arrived, he wasn't to be found. We discovered later that he was in Inman, South Carolina, picking up yet another baby elephant from David Meeks.

(voice over) One important consideration: the elephants Jones brought from Africa are African, a species with almost no history of working with man. They tend, according to most experienced handlers, to be trickier and less reliable than their Asian cousins, the elephants we're used to seeing in most zoos and circuses. Arthur Jones' staff is experienced, but what happens when they aren't around. After all, elephants can live up to 70 years.

*Mr. Jones*: You know, and sometimes I'm not even responsible for the past, Roger, don't try to hold me responsible for the future.

*Ms. Derby*: It's his responsibility. That herd was brought over as a herd, and it should remain a herd.

*Mr. Jones*: It was never our intention to keep them all, it was impossible; but if we could have saved them, certainly no harm done.

*Ms. Derby*: I really feel they should have been destroyed in Africa. It's a quick death. They would have been with their own herd. They would not have known. To send them into anything else is not kind.

*Caras* (voice over): Jones says he doesn't know how many more he will sell, what the optimum herd size may be. Taking responsibility for 96 elephants, a herd that at maturity would weigh between 850 and 900 tons, require 4600 gallons of drinking water and 32,000 pounds of food a day, could be likened to climbing onto a tiger, and Arthur Jones, comment-

ing on elephant ownership in general, said the advice of Confucius might apply.

*Mr. Jones*: "He who chooses to ride the tiger should carefully determine in advance how he intends to dismount."

*Walters*: He who chooses to bring over a herd of elephants should carefully think of what he's going to do after he has them in his backyard, shouldn't he?

*Caras*: Barbara, it's no different than going to a pound and adopting a dog or a cat. If you're rich enough to go to Africa and bring a herd of elephants then your responsibility [is] for the life of the animals, and elephants live 60 to 70 years. He's a very rich man. He should endow these animals, give them to a university, keep them together so they can be studied and they can be cared for long after he's dead and we're dead.

*Walter*: What would it cost?

*Caras*: Millions, but he's got millions—$5 million, $10 million. And if not, maybe someone in the audience will come up with the money, but clearly, they should not be dissipated like that. We just got word that six more are being sent to a circus in Mexico. It's a fate worse than death.

*Walters*: You know, we forget, isn't it cute, we're going to have all these elephants, and we're going to adopt these dogs or these cats, but we don't think of the next day. Thank you for bringing this to our attention. Let's hope that something can be done about it.

\* \* \* \* \* \*

## LEGAL ISSUES

The parties in the court-ordered joint memorandum stated the following to be the undisputed issues of law in this cause of action:

1. Under Florida law, in order for the statements upon which Jones bases his complaint to be actionable, those statements must be reasonably capable of a defamatory meaning.

2. The determination of whether the statements made in the broadcast are reasonably capable of a defamatory meaning is a question of law for the Court to decide.

3. The entire broadcast should be considered by the Court in determining whether, in the context of the broadcast, the statements made are reasonably capable of a defamatory meaning as to Plaintiff.

4. The determination of whether the statements attacked are protected statements of opinion is also a question of law for the Court to decide.

5. Plaintiff bears the burden of identifying particular statements in the broadcast, demonstrating that those statements are reasonably capable of a defamatory connotation, and demonstrating that the statements are fact rather than opinion. Summary judgment is proper if there exists no genuine issue as to any material fact.

At this time, the Court is addressing only three of the five issues presented in the motion for summary judgment; those being issues 1, 3, and 5. The parties agree that the following constitute the issues of law which the Court must resolve:

1. Whether Plaintiff has identified specific statements in the broadcast that defame him?

2. Whether the statements made in the broadcast are reasonably capable of a defamatory connotation?

3. Whether the statements made in the broadcast are protected statements of opinion and thus nonactionable?

4. Whether the "out-takes" of the March 12, 1987, broadcast are relevant in any way to the issues currently before the Court?

In *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court explicated a standard for defamation cases involving public officials. The New York Times published a political advertisement endorsing civil rights demonstrations in Alabama by black students and by implication condemned the performance of local law enforcement. A police commissioner filed suit and demonstrated in state court that certain statements in the ad referred to him and that they constituted libel *per se* under Alabama law. Defendant Times was left with the single defense of truth. The United States Supreme Court concluded that "a rule compelling the critic of official conduct to guarantee the truth of all his factual assertions" would deter protected speech. *Id.*, at 279, 84 S.Ct. at 725. The court said:

The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with "actual malice"—that is, with knowledge that it was false or with reckless disregard of whether it was false or not. *Id.*, at 279–280, 84 S.Ct. at 726.

The Court three years later in *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) extended the constitutional privilege to defamatory criticism of "public figures." Mr. Justice Brennan in the majority opinion of *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), extended the privilege even further to included defamatory falsehoods relating to private persons where the statements concerned matters of general or public interest. The plurality opinion was joined by Justices Burger and Blackmun. Justices Black and White concurred in the judgment, in separate opinions, and Justices Harlan, Marshall, and Stewart dissented.

Further modification of the privilege was had in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). The Court there stated:

We begin with the common ground. Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in "uninhibited, robust, and wide open" debate on public issues. (cite omitted) They belong to that category of utterances which "are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that

may be derived from them is clearly outweighed by the social interest in order and morality." (cite omitted)

Although the erroneous statement of fact is not worthy of constitutional protection, it is nevertheless inevitable in free debate. As James Madison pointed out in the Report on the Virginia Resolutions of 1798: "Some degree of abuse is inseparable from the proper use of every thing; and in no instance is this more true than in that of the press." (cite omitted) And punishment of error runs the risk of inducing a cautious and restrictive exercise of the constitutionally guaranteed freedoms of speech and press. Our decisions recognize that a rule of strict liability that compels a publisher or broadcaster to guarantee the accuracy of his factual assertions may lead to intolerable self-censorship. Allowing the media to avoid liability only by proving the truth of all injurious statements does not accord adequate protection to First Amendment liberties. As the Court stated in *New York Times Co. v. Sullivan, supra,* 376 U.S., at 279, 84 S.Ct., at 725: "Allowance of the defense of truth, with the burden of proving it on the defendant, does not mean that only false speech will be deterred." The First Amendment requires that we protect some falsehood in order to protect speech that matters.

The need to avoid self-censorship by the news media is, however, not the only societal value at issue ...

Some tension necessarily exists between the need for a vigorous and uninhibited press and the legitimate (state) interest in redressing wrongful injury ... In our continuing effort to define the proper accommodation between these competing concerns, we have been especially anxious to assure to the freedoms of speech and press that "breathing space" essential to their fruitful exercise. (cite omitted) To that end this Court has extended a measure of strategic protection to defamatory falsehood.

The *New York Times* standard defines the level of constitutional protection appropriate to the context of defamation of a public person. Those who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures and those who hold governmental office may recover for injury to reputation only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth. (footnotes omitted) *Id.,* at 339–342, 94 S.Ct. at 3007–3008.

*Gertz* went on to conclude that the States should retain substantial latitude in their efforts to enforce legal remedies for defamatory falsehoods injurious to private individual. So long as they do not impose liability without fault, each state may define the appropriate standard of liability for a publisher or broadcaster of defamatory falsehoods relating to private individuals. *Id.,* at 346–347, 94 S.Ct. at 3010–3011. As to public figures, the breathing space referred to in *Gertz* is provided by "a constitutional rule that allows public figures to recover for libel or defamation only when they can prove *both* that the statement was false and that the statement was made with the requisite level of culpability." *Hustler Magazine v. Falwell,* —— U.S. ——, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988). To be true "it is not essential that the literal truth be established in every detail as long as the article contains the gist of the truth as ordinarily understood." *Orr v. The Argus–Press Co.,* 586 F.2d 1108, 1112 (6th Cir.1978).

It is a question of law, for the trial judge rather than a jury, as to whether or not the statements at issue are facts or non-actionable opinion, and, if fact, whether they are reasonably capable of a defamatory meaning. *Diplomat Electric, Inc. v. Westinghouse Electric Supply Co.,* 378 F.2d 377, 382 (5th Cir.1967). There is a distinction between pure opinion and a mixed expression of opinion. Pure opinion is based on facts set forth in the broadcast or publication, or facts that are otherwise known or available to the reader or listener as a member of the public. Mixed opinion is based on facts relating to a person or his

conduct that are neither stated in the publication or broadcast nor assumed to exist by a party exposed to the communication. Rather, the communication "implies" that a concealed or undisclosed set of defamatory facts would confirm his opinion. Pure opinion is protected by the First Amendment; mixed opinion is not. *Hay v. Independent Newspapers, Inc.*, 450 So.2d 293 (Fla. 2d D.C.A. 1984). If a statement is susceptible to two interpretations, one defamatory and one not, a jury should determine whether the statement is defamatory. *Hallmark Builders, Inc. v. Gaylord Broadcasting*, 733 F.2d 1461, 1463 (11th Cir.1984).

Designation as a public figure may be based on two different bases. Some individuals achieve such pervasive fame or notoriety that they become a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. *Gertz*, at 351, 94 S.Ct. at 3012. It is for the trial judge, not the jury, to determine whether or not a plaintiff is a public figure. *Brewer v. Memphis Publishing Co., Inc.*, 626 F.2d 1238, 1255 (5th Cir.1980). In establishing limited public figure status the Eleventh Circuit Court of Appeals has adopted a three-part analysis. A court must 1) isolate the public controversy, 2) examine plaintiff's involvement in the controversy, and 3) determine whether "the alleged defamation [was] germane to the plaintiff's participation in the controversy." *Long v. Cooper*, 848 F.2d 1202, 1204 (11th Cir.1988); *Silvester v. American Broadcasting Companies, Inc.*, 839 F.2d 1491 (11th Cir.1988).

ISSUE: WHETHER PLAINTIFF HAS IDENTIFIED SPECIFIC DEFAMATORY STATEMENTS?

When the publication under scrutiny is a television broadcast, the script must be evaluated in its totality, considering all the words used and not merely a particular phrase or sentence. The words and images should be taken together, because each is an important element of the nature of the publication. *Silvester v. American Broadcasting Companies, Inc.*, 650 F.Supp. 766, 770 (S.D.Fla.1986), *aff'd*, 839 F.2d 1491 (11th Cir.1988).

The Court must also, however, distinguish between an overall *defamatory impact* and a particular *defamatory implication*. A defamatory implication, which might be actionable, is a combination of individual statements which in themselves may not be defamatory and which may be literally accurate, but, when combined, might lead the reader to draw an inference that is damaging to Plaintiff. *Herbert v. Lando*, 781 F.2d 298, 307 (2nd Cir.1986). Where the defamatory implications of the specific statements and the overall impact of the broadcast are the same it a meaningless gesture to allow the plaintiff to rest his cause of action on the "overall impact" of the broadcast. In that instance, the plaintiff is required to specifically identify those statements which he claims are defamatory and may not rely solely on the "overall impact" to establish the alleged defamation. *Id.* at 307–308.

The cause of action presents a situation where the alleged defamatory impact of the broadcast is the same as the alleged defamatory implication of the allegedly defamatory individual statements. Plaintiff is required to identify the specific defamatory statements. Plaintiff asserts that he has sufficiently identified the alleged defamatory statements. (see pgs. 11–22 of Plaintiff's response to issues 1, 3, and 5 of Defendant's motion for summary judgment). The Court agrees and will therefore address the remaining two issues presented in the present motion for summary judgment.

ISSUE: WHETHER THE STATEMENTS MADE IN THE BROADCAST ARE REASONABLY CAPABLE OF A DEFAMATORY CONNOTATION AND/OR NONACTIONABLE OPINION?

Plaintiff asserts that the broadcast as a whole, as well as specific identified statements, implies that he is a liar, a cheat, dishonest, a man who breaks promises, an animal abuser, a hypocrite, a wacky screw-

ball, inhumane, and that he acted with ulterior motives. (joint memorandum, pg. 9).

It is the Court's role to determine initially, as a matter of law, if the statements in this broadcast are "reasonably capable of a defamatory interpretation." A statement may be defamatory if it "tends to subject one to hatred, distrust, ridicule, contempt or disgrace." *Keller v. Miami Herald Publishing Co.*, 778 F.2d 711, 716 (11th Cir.1985). In determining if the statement(s) are reasonably capable of a defamatory meaning, the Court must examine how a reasonable person would have interpreted the statements. The language of the publication should not be given a tortured interpretation but should be construed as the common mind would understand the statement. *Diplomat Electric*, 378 F.2d at 381–382.

■ As to several of Plaintiff's contentions, in particular that the program implied he was an animal abuser, a wacky screwball, cheat, and acted with ulterior motives, the Court finds that no statement, nor indeed the broadcast as a whole, implies, implicates, or attributes these alleged defamatory impressions to Plaintiff. Indeed, the broadcast makes it clear that when the elephants were in the care and control of Plaintiff they "got the very best care from keepers and veterinarians." Any implication, if there was such implication, that the elephants might be abused could not reasonably be construed to refer to Plaintiff. There is nothing in the broadcast, in whole or by individual statement, that implies that Plaintiff had ulterior motives for either rescuing the elephants or for later dispersing a portion of the herd, if indeed he dispersed the herd.

■ As to the "wacky screwball" complaint, the Court finds that such a defamatory meaning can not reasonably be construed from the broadcast. A one point Hugh Downs refers to Plaintiff as an eccentric millionaire. Eccentric is not inherently derogatory or unflattering; it refers to one who deviates from an established pattern, rule or norm. The terms wacky and screwball refer to someone who is "crazily eccentric", "absurdly eccentric" or

"irrational." The Court would have to take a "tortured" route to find that the broadcast in question casts Plaintiff in such a light as a "wacky screwball" and would be reasonably interpreted as defamatory to Plaintiff in that regard. *Webster's 7th New Collegiate Dictionary*, (1967). (See, *Skolnick v. Nudelman*, 95 Ill.App.2d 293, 237 N.E.2d 804, 810 (1968) where the terms "nut," "mishuginer," and the like were found to be "name-calling" but not defamatory.)

The term "cheat" refers to someone who "deprives of something of value by the use of deceit or fraud." *Webster's 7th*. The Court finds that the broadcast, either in whole or in part, is not reasonably capable of the defamatory interpretation that Plaintiff is a "cheat."

■ The remaining "implications" asserted by Plaintiff as defamatory are that Plaintiff is "dishonest"; this assertion encompasses the assertion that they imply he is a liar, a hypocrite, and a man who breaks promises and inhumane. The broadcasts contains the following statements:

*Walters*: Well, later in this program, we'll follow up on the fate of some baby African elephants to whom a promise was not kept.

*Caras*: * * * * After a hairraising 22 hour flight, they arrived at Jones' ranch for, it was assumed, the rest of their lives. At least, that was the impression Jones gave.

This constitutes the statements in the broadcast which refers to Plaintiff's keeping a promise, or not, and perhaps to his "honesty." If these statements are factual in nature they might be actionable. However, the Court finds that these statements are non-actionable opinion. The second quoted statement is clearly the opinion of Roger Caras that he "assumed" and his "impression" of Jones was that the elephants would stay at the Jones' ranch forever. The statement does not imply "concealed or undisclosed set of defamatory facts" which would confirm that opinion. In context, of the broadcast it is clear that the first quoted statement is also non-ac-

tionable opinion and is in fact opinion based on the contents of the broadcast itself, rather than any set of "undisclosed" defamatory facts.

■ Plaintiff's final assertion to be addressed is whether the broadcast, in whole or in part, is reasonably capable of the defamatory interpretation that Plaintiff is "inhumane." The Court has carefully reviewed the printed transcript and the many hours of videotape submitted by the parties in regard to this motion for summary judgment. Based on all that the Court has read and seen, it finds that the broadcast, as a whole or in part, is not reasonably capable of a defamatory interpretation that Plaintiff is inhumane and/or is nonactionable opinion.

Much of the broadcast consists of non-actionable opinion based either on facts set forth in the broadcast or otherwise known or available to the public, i.e. expert opinion, Pat Derby's opinion as to the preferable fate of the elephants. Much of the broadcast is substantially true, i.e. the herd brought from Zimbabwe was being at least partially dispersed, the elephants were going to various environments, at least one of the elephants died in its new environment, Ralph Cramer signed the document selling some elephants to David Meeks, Jones is a millionaire.

Taken in context and without giving the broadcast any "tortured" interpretation, the Court finds that a reasonable person would not have interpreted the broadcast, in whole or in part, as being defamatory to Plaintiff. Applying the reasonable person standard, the Court finds the following interpretation is reasonable in context or the entire broadcast.

Plaintiff bought sixty-three (63) baby elephants from Zimbabwe in 1984 to protect them from being killed in a cull. Plaintiff appeared to others to be committed to saving the elephants, both emotionally and financially. Plaintiff is a millionaire. Although Plaintiff did not say so directly, some people were under the impression that Plaintiff intended to keep the elephants on his ranch "forever." Plaintiff denies that was ever his intention, as it was infeasible from the beginning. The elephants received excellent care and treatment while they were on Plaintiff's ranch.

At some point in time, the herd of sixty-three (63) elephants began to be sold to David Meeks of Little Mountain Zoological Park, Inman, South Carolina. Plaintiff contends that the sale was consummated at a time he was not in control of the elephants or the rest or his assets because he had sold them to Ward International. Ward International denies it was in control at the time of the sale and that it every sold any elephants. The bill of sale for some elephants was executed by Ralph Cramer, the foreman of the ranch, and David Meeks. David Meeks' private zoo is where the elephants are first taken after sale. There they are trained and readied to go on to new owners, including circuses, zoos, and private owners. At least one of the elephants died after it was sold by Meeks to a small circus. Plaintiff had no control over the elephants after they were sold, and according to his own statements had no control over their sale.

In the opinion of some, including Pat Derby "expert elephant handler" the "dumped" elephants may become problems if they are not properly handled after they leave the herd. Ms. Derby's opinion is that the elephants would have been better off being left to the cull than having the herd separated. It is also the opinion of Roger Caras that life for an elephant in a circus in Mexico is a fate worse that death. Ms. Derby, as well as Roger Caras and Barbara Walters, are of the opinion that Plaintiff should have assumed responsibility for the elephants forever and keep the herd together. Mr. Caras thinks Plaintiff should endow the herd with some of his millions. The Court, as a matter of law, finds that this "reasonable person" interpretation of the broadcast in question is not reasonably capable of a defamatory meaning that Plaintiff is inhumane. A more reasonable interpretation is that some people, including a person who has experience with elephants, feel that Plaintiff should have kept all the elephants and somehow endowed their future, because the next owner of the

elephant(s) might not provide as good a home as Plaintiff had in his ownership. Accordingly, it is

ORDERED that Defendant's motion for summary judgment on issues 1, 3, and 5 be granted and this cause of action be dismissed with prejudice.